CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUL 19 2024

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| NATALIE A., | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:21cv00024 |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| MARTIN O'MALLEY, | ) | |
| Commissioner of Social Security, | ) | By:  Joel C. Hoppe |
| Defendant.[1] | ) | United States Magistrate Judge |

Plaintiff Natalie A., appearing pro se, asks this Court to review the Commissioner of Social Security's final decision denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. *See* Compl., ECF No. 3; Civ. Cover Sheet, ECF No. 3-1; Mem. Op. of Jan. 30, 2023, at 1–3, ECF No. 18. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 29-1; the parties' relevant filings, ECF Nos. 14, 16, 32, 33, 37, 41; and the applicable law, I find that substantial evidence does not support the Commissioner's final decision on Natalie's SSI claim. R. 1, 11–20. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).[2]

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

---

[1] Commissioner O'Malley is hereby substituted as the named Defendant in this action. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

[2] I will deny Natalie's request for oral argument, ECF Nos. 33, 39, because the facts and legal positions are adequately presented in the materials before the court and a hearing would not help the decisional process. *See* Fed. R. Civ. P. 78(b); W.D. Va. Gen. R. 4(c)(2).

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20

C.F.R. § 416.905(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

This civil action concerns Natalie's fourth unsuccessful claim for disability benefits. *See* R. 1, 11–12, 373; Civ. Cover Sheet § IV (citing Title XVI); ECF No. 14 (citing R. 19); ECF No. 33 (citing R. 15–19, 52–53); ECF No. 41 (citing R. 15–17, 18–19, 33–40, 49). In April 2012, Natalie filed for SSI and disability insurance benefits ("DIB"), under Title II of the Act, 42 U.S.C. §§ 401–434, alleging she had been disabled by narcolepsy, obesity, and knee pain since January 2009. *See* R. 60, 62–63 (Sept. 3, 2014). Virginia Disability Determination Services ("DDS"), the state agency, denied both claims initially and upon reconsideration. R. 60, 96. In July 2014, Natalie appeared without counsel and testified at an administrative hearing before ALJ H. Munday. R. 60; *see* ECF No. 14.[4] A vocational expert ("VE") also testified at this hearing. *See* R. 60, 69–70.

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[4] The current record does not contain a transcript of Natalie's "first administrative law judge hearing," ECF No. 14. *See generally* R. 1–422. ALJ Munday's subsequent unfavorable decision contains her summary of both Natalie's hearing testimony, R. 64–65, and relevant medical evidence documenting

On September 3, 2014, ALJ Munday issued a written decision finding that Natalie's

"severe" narcolepsy and obesity, R. 62, resulted in a residual functional capacity ("RFC") for

"work at all exertional levels" with some reduced postural activities, no exposure to "hazardous

conditions, including unprotected heights and moving machinery," and "the option to take a 30-

minute nap at lunch," R. 64. *See* R. 67–68 (narcolepsy symptoms analysis). Relying on the VE's

testimony, ALJ Munday found that this RFC allowed Natalie to return to her "past relevant work

as a health unit coordinator, associate/cashier II, dietary aide[,] and office helper," R. 69, or to

transition to certain "medium and light unskilled occupations" in the national economy, R. 70.

ALJ Munday's September 3, 2014 decision is the Commissioner's "final decision" that Natalie

was not disabled on or before that date. R. 11; 20 C.F.R. § 416.1455.

In August 2015, Natalie filed another DIB claim, R. 134–35, alleging that she had been

disabled by narcolepsy, arthritis, and knee pain since March 1, 2014. *See* R. 83–93 (Ex. B4A)

(May 10, 2016); R. 95–105 (Ex. B6A) (July 27, 2016). The DDS physicians who reviewed

Natalie's records in mid-2016 concluded that her "remote history of narcolepsy" was a "non-

severe" medically determinable impairment ("MDI") because it did "not significantly limit [her]

physical or mental ability to do basic work activities" on or before March 31, 2014.[5] *See* R. 88–

89, 90, 92, 100, 102. They opined that she "should be restricted from heights [or] hazards due to

---

Natalie's narcolepsy symptoms and treatment from September 25, 2002, through March 8, 2011, R. 65–
67. Only the March 8, 2011 treatment note is in the current record. R. 315–16 (Ex. B2F).

[5] March 31, 2014, is Natalie's date last insured, or "DLI." R. 62, 83, 87; *see Bird v. Comm'r of Soc. Sec.
Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). To qualify for disability benefits on this DIB claim, Natalie
needed to prove that she was "disabled" on or before her DLI. *See Johnson*, 434 F.3d at 655–56. ALJ
Munday's unfavorable decision dated September 3, 2014, establishes as a matter of law that Natalie failed
to make this showing. R. 11. Natalie's DLI is not material to whether she is entitled to disability benefits
based on her subsequent SSI claim (filed June 26, 2017) at issue in this civil action, R. 20 (citing R. 361–
62). *See generally Reddit v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18,
2014); 20 C.F.R. §§ 416.202, 416.335, 416.501.

[her] history of narcolepsy," but that she had "no other limitations" during the relevant time. R. 88, *accord* R. 90–91, 100–02. Both DDS reviewers gave "great weight" to ALJ Munday's decision dated September 3, 2014, because the evidence she relied upon did "not differ from [the] evidence" relevant to this new DIB claim. *See* R. 88–89, 91–92, 101–02, 104 (citing R. 60–69). The current record indicates that Natalie "abandoned" her DIB claim after DDS denied it upon reconsideration in late July 2016, R. 94. *See, e.g.*, R. 1, 11–22, 114, 203, 360. The DIB claim is not at issue in this civil action.

On June 26, 2017, Natalie filed the SSI claim at issue in this civil action. R. 361–62; *see* R. 1–2, 11–20. She alleged that she had been disabled since September 4, 2014, because of narcolepsy with "excessive daytime sleepiness" and arthritis. R. 372–77; *see* R. 184, 187–94. Natalie was 38 years old, or a "younger person" under the regulations, on her alleged onset date.[6] R. 372; 20 C.F.R. § 416.963(c). In October 2017, DDS reviewer Catherine Howard, M.D., found that Natalie had a "non-severe" unspecified nervous-system disorder and a "severe" dysfunction of an unspecified major joint. R. 377 (Ex. B5 SSI); *see* R. 373–75, 380; R. 294–317 (Ex. B2F);

---

[6] This alleged onset date ("AOD") is one day after ALJ Munday denied Natalie's prior DIB/SSI claims on September 3, 2014. R. 71, 184–85. Natalie's AOD is not necessarily material to this civil action because SSI benefits cannot be paid for any period before the month in which the claimant filed her SSI claim. *See* 20 C.F.R. §§ 416.202, 416.501. Natalie filed this SSI claim on June 26, 2017. *See* Def.'s Br. 4 & n.5, ECF No. 37. Nonetheless, the ALJ's written decision denying the claim makes clear that the ALJ's material findings and conclusions concern the entire period "from September 4, 2014, through the date" she issued that decision on September 18, 2019. R. 19; *see, e.g.*, R. 14, 17–18. Perhaps recognizing this error's potential harm, the Commissioner's brief focuses on a "much shorter" period, Def.'s Br. 4 n.5, from "June 26, 2017, . . . through June [sic] 18, 2019, the date of the ALJ's decision," *id.* at 4. *See generally id.* at 4–6, 9, 13–14. For the Court to uphold the denial of Natalie's SSI claim, however, it "must . . . affirm the ALJ's decision only upon the reasons [s]he gave." *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80 (1943)). The Commissioner's post-hoc attempt to shorten the period considered by the ALJ impermissibly "ignores the ALJ's finding[s]" that are subject to judicial review under 42 U.S.C. § 405(g). *Bobby P. v. Comm'r of Soc. Sec.*, No. 4:17cv17, 2020 WL 6537650, at *7 (W.D. Va. Nov. 6, 2020) (citing *Patterson*, 839 F.2d at 225 n.1). It also fails to address "specific deficienc[ies] in the ALJ's analysis" of *all* relevant evidence in Natalie's record, *id.*, as explained below. *See also Julie J. v. O'Malley*, No. 5:23cv7, 2024 WL 890001, at *3 n.3 (W.D. Va. Mar. 1, 2024); *Andrew V. v. Saul*, No. 5:18cv55, 2019 WL 4262505, at *4–5 (W.D. Va. Sept. 9, 2019).

R. 326–28 (Ex. B7F); R. 329–34 (Ex. B8F). Nonetheless, Dr. Howard opined that Natalie's

record contained "insufficient evidence to make a decision" because she "fail[ed] to cooperate"'

with the agency's "multiple attempts" to obtain more information about her treatment history and

current activities of daily living. *See* R. 376–77. Natalie produced additional records in the spring

of 2018. R. 392–93; *see* R. 204–11 (Ex. B15E); R. 212–19 (Ex. B16E); R. 392–93, 395 (Ex. B9

SSI); R. 338–43 (Ex. B10F). That May, DDS reviewer James Darden, M.D., denied Natalie's

SSI claim upon reconsideration. R. 389–403 (Ex. B9 SSI).

    On July 3, 2019, Natalie appeared without counsel and testified at another hearing before

ALJ Munday. R. 28–56; ECF No. 14. A VE also testified at this hearing. R. 51–55. During the

hearing, Natalie said that she wanted to present a recent statement from Joseph Khoury, M.D., a

physician at Lynchburg Pulmonary Associates ("Lynchburg Pulmonary") who had followed

Natalie's narcolepsy off-and-on since September 2002. R. 31, 39, 42–43; *see also* R. 65, 67

(citing Dr. Khoury's treatment notes dated September 25, 2002, August 23, 2007, and October

30, 2007); R. 356–59 (Apr. 1, 2019). ALJ Munday incorporated Dr. Khoury's statement, R. 349

(Ex. B12F) (June 27, 2019), as well as a letter from Natalie's sister Regina, R. 250 (Ex. B25E)

(undated), into the current record. ALJ Munday also noted that in October 2015, the agency had

asked Lynchburg Pulmonary for Natalie's treatment "records from January 2008 to the present,"

but that it did not receive any. R. 43–44 (citing R. 318). After this hearing, agency staff asked

Lynchburg Pulmonary to produce Natalie's "treatment notes from 09/04/2014 to Present." R.

350. The clinic produced one record of a visit with Dr. Khoury on April 1, 2019. R. 353–59 (Ex.

B14F).

    ALJ Munday issued an unfavorable decision on September 18, 2019. *See* R. 11–20. She

defined the relevant period as "September 4, 2014, through the date of this decision." R. 19; *see*

*also* R. 11–12, 14, 17, 19–20. ALJ Munday found that Natalie had "not engaged in substantial gainful activity since September 4, 2014, the alleged onset date." R. 14. Natalie was employed a few times after this date, "earning $337.40 in 2015, $740.75 in 2016, $1,112.08 in 2017, $2,112 in 2018, and $993 in 2019[,] but this work activity did not raise to the level of substantial gainful activity," or "SGA." *Id.* (citing R. 136–48). Natalie had two "severe" MDIs during the relevant period: "obesity and a history of narcolepsy."[7] *Id.* ALJ Munday concluded that Natalie's history of narcolepsy did not medically equal Listing 11.02, which sets out the criteria for presumptively disabling epilepsy, "because her episodes did not occur with the required frequency or result in marked limitation in physical functioning or an area of mental functioning." R. 15 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02(C)–(D)).

ALJ Munday then evaluated Natalie's RFC during the relevant period. R. 15–19. She found that Natalie could "work at all exertional levels," but was limited to "frequent" stooping, kneeling, crouching, crawling, and climbing ramps and stairs; "occasional" balancing; and never climbing ladders, ropes, and scaffolds or working around "hazardous conditions, including unprotected heights and moving machinery." R. 15. Natalie was also limited to "simple, routine tasks" with the "option to take [a] 30 minute nap at lunch." *Id.* At step four, ALJ Munday found that Natalie's RFC allowed her to perform her "past relevant work as a hand packer, fast food cashier, and retail cashier" as those unskilled jobs were "actually and generally performed." R. 18 (citing R. 51–54). ALJ Munday found that all three of those jobs qualified as Natalie's "past relevant work," or "PRW," because Natalie performed such work: (1) within the past 15 years,

---

[7] The ALJ also found that Natalie's "history of arthritis" was a non-severe MDI because there was "no indication from the evidence of record that this impairment had more than a minimal effect on [her] functional capabilities for the 12-month durational requirement of the regulations." *Id.* (citing R. 338). *But see* R. 397–400. Natalie does not challenge this finding on appeal. *See generally* ECF Nos. 14, 16, 32, 33, 37, 41.

(2) at a level constituting SGA, and (3) "for long enough . . . to achieve average performance."

*Id. But see* R. 14, 33–37, 137–40, 148, 158–59, 184, 189, 212–16. Alternatively, she found at

step five that Natalie's RFC and vocational profile allowed her to do other "unskilled"

occupations (cafeteria attendant, order clerk, production helper) existing in the national

economy. R. 19 (citing R. 52–53). Based on these findings, ALJ Munday concluded that Natalie

was not disabled from September 4, 2014, through September 18, 2019. R. 18–20. The Appeals

Council declined to review that decision, R. 1–2, and this appeal followed, ECF Nos. 18, 19.

### III. Discussion

Natalie is representing herself in this case. Liberally construed, her filings challenge ALJ

Munday's RFC determination that Natalie's narcolepsy symptoms did not prevent her from

working full-time, as long as she was limited to simple, routine tasks and could take a 30-minute

nap at lunch, R. 15. *See* ECF No. 14 (citing R. 19); ECF No. 33 (citing R. 15–19, 52–53); ECF

No. 41 (citing R. 15–17, 18–19, 33–40, 49).[8]

A.    *The Legal Framework*

A claimant's RFC is her "maximum remaining ability to do sustained work activities in

an ordinary work setting" for eight hours a day, five days a week despite her MDIs and related

---

[8] Natalie also asserts that ALJ Munday made "racist" comments at the hearing, ECF No. 32, and "denied the [SSI] claim because of the color of my skin," R. 33. She does not explain these accusations, which are "nothing more than [her own] conjecture and speculation," *Bishop v. Barnhart*, 78 F. App'x 265, 269 (4th Cir. 2003) (per curiam) (claimant's "conjecture and speculation" that ALJ's refusal to order a consultative examination was racially motived did not show an Equal Protection Clause violation). *See also* Def.'s Br. 15 n.10 (collecting cases). In any event, Natalie's vague references to racial bias are not enough to raise a cognizable Equal Protection Clause challenge to the Commissioner's denial of benefits. *Cf. Beaudett v. City of Hampton*, 775 F.2d 1274, 1277–78 (4th Cir. 1985) ("[J]udges are not mind readers. Even in the case of *pro se* litigants, they cannot be expected to construct full blown claims from sentence fragments."). Accordingly, I address only Natalie's arguments related to her narcolepsy symptoms and associated functional limitations. ECF Nos. 14, 33, 41.

symptoms.[9] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual

finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller*

*v. Astrue*, 459 F. App'x 266, 230–31 (4th Cir. 2011), including objective medical evidence,

medical-source opinions, and the claimant's symptoms or other subjective statements, 20 C.F.R.

§ 416.945(a), (e). *See, e.g.*, *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir.

2017) ("This RFC assessment is a holistic and fact-specific evaluation" made after the ALJ

"evaluate[s] 'all' relevant record evidence" (quoting 20 C.F.R. § 404.1520(e)). The RFC finding

should reflect all credibly established "restrictions caused by medical impairments and their

related symptoms" that impact the claimant's "capacity to do work-related physical and mental

activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1–2; *see Mascio*

*v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir.

2016).

The Commissioner "has specified the manner in which an ALJ should assess a claimant's

RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by

definition "a function-by-function assessment based upon all of the relevant evidence of [the

claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ

must identify each MDI-related functional limitation that is supported by the claimant's record.

*See Monroe*, 826 F.3d at 179. Second, the ALJ must provide a "narrative discussion describing"

how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC

assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how she weighed any

---

[9] "Symptoms means your own description of your physical or mental impairment." 20 C.F.R. §
416.902(n). "[S]tatements about your pain or other symptoms will not alone establish that you are
disabled. There must be objective evidence from an acceptable medical source that shows you have a
medical impairment(s) which could reasonably be expected to produce the pain or other symptoms
alleged and that, when considered with all of the other evidence, . . . would lead to a conclusion that you
are disabled." *Id.* § 416.929(a).

conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311.

Generally, a reviewing court will affirm the ALJ's RFC findings when she considered all the

relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*,

873 F.3d 251, 268–72 (4th Cir. 2017), and her written decision builds an "accurate and logical

bridge from that evidence to h[er] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th

Cir. 2018), *superseded on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th

Cir. 2023). *See, e.g.*, *Thomas*, 916 F.3d at 311–12.

The claimant's symptoms play a critical role in a proper RFC assessment. *See Mascio*,

780 F.3d at 636–37; 20 C.F.R. § 404.1529(a), (c). The regulations set out a two-step framework

for ALJs to evaluate symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 416.929. "First, the ALJ

looks for objective medical evidence showing a condition that could reasonably produce the

alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step,

"the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's

symptoms to determine the extent to which they limit the claimant's ability," *id.*, to work for

eight hours a day, five days a week, *see Mascio*, 780 F.3d at 639. The claimant's "symptoms,

including pain, will be determined to diminish" her ability to work on that basis "to the extent

that [the] alleged functional limitations and restrictions" resulting from those symptoms "can

reasonably be accepted as consistent with the objective medical evidence and other evidence" in

the record. *See* 20 C.F.R. § 416.929(c)(4).

"The second determination requires the ALJ to assess the credibility of the claimant's

statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. In doing so, the

ALJ must consider all the evidence in the record bearing on the claimant's allegations that she is

disabled by pain or other symptoms caused by an established MDI or related treatment. *See* 20

C.F.R. § 416.929(c). This information can include objective medical evidence, like findings on

exams or diagnostic studies; the claimant's daily activities; the type, frequency, effectiveness,

and side effects of treatment (including medications) the claimant receives or has received to

alleviate her allegedly disabling symptoms; and the claimant's compliance with prescribed

treatment. *See id.* §§ 416.929(c), 416.930(a). The ALJ must give specific reasons, supported by

"references to the evidence," for the weight assigned to the claimant's statements, *Edwards v.*

*Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p,

1996 WL 374186, at *2, *4–5). Her articulated reasons for discounting a claimant's complaints

of disabling symptoms need only be legally adequate and logically supported by the evidence

that she recounted. *See Brown*, 873 F.3d at 269 ("[T]he ALJ must build an accurate and logical

bridge from the evidence to his conclusion that the claimant's testimony was not credible."

(cleaned up)); *Dunn v. Colvin*, 607 F. App'x 264, 273–74 (4th Cir. 2005) (discussing legally

permissible reasons in most cases).

     Natalie's pro se filings focus on the ALJ's apparent rejection of Natalie's testimony that,

because of her narcolepsy, she is "unable to control falling asleep." ECF No. 14 (citing R. 19).

This particular symptom causes extreme difficulty concentrating, persisting, maintaining pace,

and remembering information. ECF No. 41, at 1–2. Natalie "tried to work like a normal person"

notwithstanding her narcolepsy, but she had "trouble remembering instructions" and was "much

slower trying to finish task[s]." *Id.*; *see also id.* at 1 (listing more than 20 prior jobs); ECF No. 14

("[C]an someone explain how being unable to control falling asleep [is] not a disability on page

9 reference is made to the vocational expert but it clearly said based on his experience not mine."

(citing R. 19)). Natalie's inability to control falling asleep also makes it extremely "difficult [for

her] to keep a set schedule and be on time and present" for work. *Id.* at 2. On appeal, Natalie

objects to ALJ Munday's reliance on the VE's testimony that Natalie (or her hypothetical comparator) could still work full-time if she was limited to "simple, routine tasks" and had the option to take a 30-minute nap at lunch. *See* R. 18–19 (citing R. 50–53); ECF Nos. 14, 41. She also correctly points out that the VE testified "there would be no work available," ECF No. 33, if Natalie (or her comparator) either "had two unplanned absences a month" *or* would be "off task 15 percent of the time," R. 53–54. Liberally construed, Natalie argues that ALJ Munday failed to explain why Natalie's narcolepsy symptoms did not credibly establish either RFC limitation. *See* ECF Nos. 14, 33, 41. I agree. ALJ Munday also failed to cite any record evidence supporting her RFC finding that Natalie could perform simple, routine tasks as long as she had the "option to take [a] 30-minute nap at lunch," R. 15; cherrypicked from Natalie's testimony describing her daily activities, R. 15–16; and mischaracterized or ignored other probative evidence concerning the "severity of her [narcolepsy] symptoms and limitations" throughout the relevant time, R. 16. These clear legal errors require reversal and remand.

B.   Summary

1.   Record Evidence[10]

a.   Medical Evidence

Natalie "alleges that she is disabled by her narcolepsy." R. 15; *accord* R. 33–49, 53–54, 204–11, 349, 338, 357. On August 24, 2016, Natalie visited her primary care provider to ask about restarting narcolepsy treatment. R. 333 ("Dr. Khour[y] was OK years ago but not very helpful."). Her symptoms included "excessive daytime sleepiness," which had "worsened" over

---

[10] Some of the evidence summarized below was created before Natalie filed this SSI claim in June 2017. "Courts routinely find that ALJs should consider evidence that predates" the application in order to fully understand the claimant's medical condition during the relevant time. *Andrew V.*, 2019 WL 4262505, at *4; *see Julie J.*, 2024 WL 890001, at *3 n.3. Here, ALJ Munday expressly weighed evidence dating back to September 2014. *See* R. 17 (citing R. 64).

the years. R. 333–34. Findings on that day's physical exam were normal. R. 334. The provider

referred Natalie to Kimberly Bird, M.D., at Danville Pulmonary Clinic to evaluate her

narcolepsy. *See* R. 326, 333–34.

Natalie saw Dr. Bird in October 2016. R. 326 (Ex. B7F). Natalie reported that she last

saw Dr. Khoury in 2008 and that her last sleep study was in 2004. *Id.* By October 2016, Natalie

had "been off medical therapy for over 8 years." *Id.* She reported "[e]xcessive daytime

sleepiness" and frequent daily naps. R. 326–27. Her naps "last[ed] a few minutes to several

hours, and she [did] not feel refreshed" when she woke up. R. 326. Dr. Bird's physical exam

findings were generally normal. *See* R. 327–28. She scheduled Natalie for a diagnostic sleep

study to take place the following day. R. 328. Natalie asked if she could start taking Xyrem or

another narcolepsy medication that day, but Dr. Bird said that they needed to wait for the sleep

workup and a review of her "prior records in order to decide on her treatment plan." *Id.* Natalie

did not attend the sleep study. *See* R. 395 ("Clmt advises she hasn't had a sleep test for yrs and

definitely not in 2016.") (Mar. 6, 2018). In June 2017, Natalie told DDS that she was taking

Xyrem for narcolepsy. R. 190–91. That August, she visited her primary care provider after a car

accident. R. 331–32 (Ex. B8F). She did not report any narcolepsy symptoms or medications at

this visit. *See id.*

In February 2018, Natalie told DDS that she did not take any prescription medications. R.

195. That April, Natalie attended a consultative physical exam with Serhish Memon, M.D. R.

338–43 (Ex. B10F). She reported taking Xyrem and Provigil for narcolepsy. *See* R. 338. "Her

current symptoms include[d] sleepiness and fatigue." *Id.* Narcolepsy limited "her ability to work

secondary to fatigue." *Id.* She also reported "difficulties with memory." R. 339. "Her typical

daily activities consist[ed] of resting and taking naps throughout the day." *Id.* On exam, Dr.

Memon observed that Natalie "was alert and had good eye contact and fluent speech." R. 343.

Her "[m]ood was appropriate and [she] had clear thought processes. [Her] memory was normal

and concentration was good. [Natalie] was oriented to time, place, person, and situation. [She]

did not appear fatigued on exam." *Id.* Natalie's muscle strength, bulk, and tone were normal

throughout. R. 340. She "perform[ed] all exam maneuvers without difficulty." R. 342. Dr.

Memon opined that Natalie could "be expected to sit, stand and walk normally in an 8-hour

workday with normal breaks," and frequently bend, stoop, crouch, or squat. R. 343. Natalie

could carry 15 pounds frequently and 30 pounds occasionally. *Id.* She had "no relevant . . .

workplace environmental limitations." *Id.*

In May 2018, Dr. Darden opined that Natalie's "primary problem [was] with Narcolepsy,

now complicated [by] arthritis symptoms." R. 400. Both conditions were "severe" MDIs that

could reasonably be expected to cause Natalie's alleged physical pain and "[u]nderstanding and

memory limitations." R. 397–98. Dr. Darden opined that Natalie could occasionally lift/carry 50

pounds, frequently lift/carry 25 pounds, sit and stand/walk each for "[a]bout 6 hours in an 8-hour

work-day," and frequently climb, kneel, crouch, or crawl. R. 399–400. Natalie should "[a]void

concentrated exposure" to workplace hazards given her "[h]istory of narcolepsy." R. 400. Dr.

Darden did not identify any limitations on Natalie's abilities to understand, remember, or follow

instructions; to stay on task and pay attention to her work; or to get to work on time and stay

awake for a full workday. R. 397–400; *see* 20 C.F.R. §§ 416.922(b)(3), 416.945(c).

Natalie reestablished care with Dr. Khoury in April 2019. *See* R. 356–59 (Ex. B14F). Dr.

Khoury noted that he first saw "her in 2002 [when] she had profound excessive sleepiness as

well as sleep paralysis. An overnight sleep study at that time showed no significant sleep

disorder [affecting] breathing. Multiple sleep latency test[s] showed an abnormal mean sleep

latency." R. 356. Dr. Khoury had treated Natalie's prior symptoms "with wakefulness promoting

agents which seemed to help to some small degree. She ultimately tried Xyrem, but was

concerned about side effects and did not use it for more than a week." R. 356. As of April 2019,

Natalie "ha[d] not been seen in almost 10 years. She [was] currently not on any sort of therapy

and remain[ed] profoundly sleepy." *Id.* ("Her current Epworth sleepiness score is severely

elevated at 20."). Natalie reported "having sleep paralysis frequently," but she "d[id] not have

significant cataplexy." *Id.* She also denied deceased memory. *Id.* Natalie told Dr. Khoury that

she wanted to restart Xyrem. *Id.*

Dr. Khoury spent 45 minutes talking with Natalie about her symptoms and treatment

options. *See id.* ("Full exam not performed; 45 minutes spent on encounter."). He noted that

Natalie had "proven narcolepsy, which [he thought was] still clearly a major medical issue for

her." R. 357. Dr. Khoury "believe[d] that the best initial treatment would indeed be Xyrem with

a dose of 6g total per night. If she fail[ed] to respond [he] would increase the dose to 9g per

night. Ultimately she may need to resume wakefulness promoting agents" or undergo another

sleep study. *Id.* He instructed Natalie to "return in roughly 2 months to see if the Xyrem therapy

is beneficial for her." *Id.* There are no subsequent treatment notes in the record. R. 42–43, 350.

On June 27, Dr. Khoury wrote a letter supporting Natalie's claim that she was disabled

by narcolepsy. *See* R. 349 (Ex. B12F). He opined that Natalie had "significant symptoms of

excess sleepiness related to this diagnosis. She [was] currently being treated with multiple

medications" for narcolepsy, which would "be a lifelong problem" for her. *Id.*; *see also* R. 38–

39. Dr. Khoury concluded his letter, "Please take this into consideration when considering her

disability application." R. 349. He did not identify any functional limitations associated with

Natalie's "significant" excess sleepiness. *See id.*

*b.*   *Natalie's Statements*

Natalie completed an Adult Function Report in March 2018. R. 204–11 (Ex. B15E). She said she lived in a house with her husband and high-school aged son. *See* R. 45, 204–05. She took care of them both, but her husband helped. R. 205. Her daily routine varied. R. 204. She usually fell asleep "soon after" waking up, and she slept "often." R. 204–05. She could feed herself and brush her teeth—assuming she remembered to do so. *See id.* "It help[ed]" to be reminded about those things. R. 206. Natalie was "afraid to cook" on the stove because she might leave it on or burn herself. R. 205–06. She made salads and sandwiches on a daily basis, but those did "not [take] long" to prepare. R. 206. She could clean, do laundry, and wash dishes. R. 206. It might take her "hours [or] days" to finish because she would "start[,] fall asleep[,] wake up do a little more[, and] fall asleep" again. *Id.*; *see also* R. 209 ("Do you finish what you start? No.") She drove herself to stores to shop for clothes or groceries. R. 207. Natalie did not have any hobbies or interests, but she did go to church once or twice a week. R. 208. Otherwise, she "stay[ed] at home." R. 209. Narcolepsy impaired Natalie's memory. R. 204–06, 209. She followed written instructions "well," but she would "forget quick" when given spoken instructions. R. 209.

In July 2019, Natalie testified that she took Xyrem and at least one other medication for her narcolepsy symptoms. *See* R. 39 (Q: "Okay. And what is your treatment for narcolepsy?" A: "Xyrem and --" Q: "Medications?" A: "Yeah. Yes." Q: "I'm not asking you to -- give me a specific -- I'm just asking -- if it's -- what it is." A: "Okay." Q: "Any other treatment besides medications?" A: "No."). She saw Dr. Khoury on a "regular basis," meaning "once [or] twice a year." R. 42. Natalie explained that "[h]e's the one who diagnosed the narcolepsy" years ago, "so [she] thought [the agency] had that" information from 2006 or 2007. *Id.*; *see* R. 65–67 (same

ALJ's prior decision citing Dr. Khoury's treatment notes dated September 25, 2002, August 23, 2007, and October 30, 2007). ALJ Munday responded that the record on Natalie's most recent disability claims did not contain "very many medical records" and there were no treatment notes from Dr. Khoury or Lynchburg Pulmonary. R. 43–44. She also noted that in October 2015, the clinic told DDS that it did not have any "records from January 2008 to the present." R. 44 (citing R. 318). ALJ Munday did not ask Natalie to explain this gap in her narcolepsy treatment. *See* R. 65 (same ALJ's summary of Natalie's prior testimony that "she requested samples of Provigil from Dr. Aiken in March 2011, [R. 315–16,] but she said she did not seek recommended follow up with Lynchburg Pulmonary because she said she did not have the money").

Natalie testified that she slept "[m]ost of the time." R. 48. She did not "cook" food because she might fall asleep while the stove is on. R. 45–46. Sometimes she microwaved a frozen dinner or other "simple" food, R. 46–47, but usually her husband made sure that she ate when he got home from work, R. 45. Natalie did laundry, swept the floor, and watched TV. R. 47–48. She drove roughly "four times a week," either to work, the grocery store, medical appointments, or church. *Id.*; *see* R. 33–34, 42. Otherwise, she stayed at home and did "nothing" all day. R. 48. Natalie's sister, Regina, also wrote a letter intended "to highlight how [she] ha[d] seen narcolepsy affect [Natalie's] life." R. 250 (undated). In Regina's experience, "Natalie is subject to fall asleep at any given time. . . . Everyone will be sitting around talking, and [they] are subject to look around and see Natalie asleep." *Id.* "She usually asks to ride with [Regina] when [they] go long distances. She will get in the car and sometimes before we ever even reach the end of the road she is snoring." *Id.* Natalie "seems to be able to stay focused when she is driving. If her tiredness gets to be too bad, she will pull over and take a nap." *Id.*

     c.    *Natalie's Employment History*

In July 2019, Natalie testified that a "manufacturing temp agency" currently employed her to "pack bottles." R. 33. She worked "once a week, if that." *Id.* "Physically and mentally [she] can't do more than that." R. 34. Natalie explained that she had "had over 20 jobs in [her] life time." R. 40. From 2004 onward, she generally worked at most eight hours a day, three days per week. R. 33–38, 189, 201–17; *see also* R. 64–65 (same ALJ's summary of Natalie's prior testimony describing her jobs between 2002 and 2014). None of her jobs in 2012–2018 lasted more than a few months. *See* R. 35–36, 147–48, 153, 184, 189, 212.

At the hearing, Natalie attributed these past employment problems to specific narcolepsy symptoms. R. 40, 49; *see* R. 15 ("The claimant alleges that she is disabled by her narcolepsy. She testified that she fell asleep abruptly and had trouble getting to work on time. . . The claimant asserted that she had memory issues and tended to forget instructions and she noted that failing to complete tasks had interfered with maintaining employment in the past."). She explained that "narcolepsy is a sleep disorder, so [she] can fall asleep at any time." R. 40. Natalie noted that, at least to her former employers, it did not matter how well she performed her job duties. *See* R. 40–41, 49, 53–54. "[A]t the end of the day, if [she] cannot get there on time, if [she's] not there - - over time, they don't see [her] as a good employee." R. 40; *see* R. 49. Her narcolepsy also caused "memory lapse[s]" at work. R. 40; *see also* R. 41, 49. For example, if Natalie's boss "told [her] to do five things, [she] might forget two of them." R. 40. She either needed people to "repeat stuff," R. 40, or she "[w]on't complete all the tasks they want done," R. 49.

The VE testified about Natalie's "past work within the last 15 years." R. 51; *see* R. 50–54. He classified her "current job" packing bottles as a "hand packer." R. 51 (DOT No. 920.587-018, SVP 2). Natalie had also worked as a fast-food cashier (DOT No. 311.472-010, SVP 2) and a retail cashier (DOT No. 211.462-010, SVP 2). The VE testified that someone who was limited

to "simple routine[] tasks" and needed "the option to take a 30-minute nap at lunch" could

perform all three unskilled occupations. R. 52. This person could also do other unskilled jobs

existing in the national economy, such as cafeteria attendant, order clerk, or production helper.

*See* R. 52–53. However, "[t]here would be no work" if this same person would *either* "be off

task 15 percent or more of the time" *or* have "two unplanned absences a month[] on a regular

basis." R. 53. Natalie asked ALJ Munday whether this "means . . . I wouldn't have a job" if she

had two unplanned absences a month or would be off task 15 percent of the time. R. 53–54; *see

also* R. 33–37, 40, 49. ALJ Munday responded, "The hypothetical person, that's correct." R. 54.

    *2.    The ALJ's Decision*

    ALJ Munday briefly summarized some of this evidence in her written decision. *See* R.

15–18 (citing R. 40–41, 45–47, 49, 51–52, 88, 204–09, 250, 331–32, 338–43, 356–59). She

found that Natalie's severe narcolepsy "could be reasonably expected to cause [her] alleged

symptoms," but that Natalie's "statements concerning the intensity, persistence, and limiting

effects of these symptoms [were] not entirely consistent with the medical evidence and other

evidence in the record for the reasons explained in [the ALJ's] decision." R. 16 ("The claimant's

allegations regarding the severity of her symptoms and limitations are not supported by the

record."). First, Natalie "did not seek treatment consistent with her alleged symptoms." *Id.* ALJ

Munday explained that the "record show[ed] a single appointment for narcolepsy during the

period at issue," *id.* (citing R. 356–59), and that Natalie "indicated that *she had not required

medication or other treatment prior to* [this] April 2019 appointment," *id.* (emphasis added). *But

see* R. 190–91 (June 2017); R. 333 (Aug. 2016); R. 326 (Oct. 2016); R. 338 (Apr. 2018); R. 356–

59 (Apr. 2019). Second, "[e]ven before beginning treatment," Natalie was "cooperative with

medical personnel and her mental and physical examinations were generally unremarkable,

finding full strength, range of motion, and reflexes; normal gait; and intact memory and concentration." R. 16 (citing R. 332 (Aug. 2016); R. 339–42 (Apr. 2018)). Finally, ALJ Munday found that Natalie had "acknowledged that her narcolepsy did not prevent her from doing housework, preparing simple meals, driving, shopping in public, and attending church services." *Id.* (citing R. 204–11, 250). *But see* R. 15–16 ("She acknowledged that she could prepare simple meals that *did not involve the stove*. . . . The claimant reported that she could do laundry, clean, and wash dishes, *but sometimes fell asleep before completing tasks*." (emphasis added)).

To ALJ Munday, "[t]hese factors support[ed] finding [Natalie] ha[d] no exertional or manipulative limitations." R. 16. Natalie's "reported tendency to fall asleep, and her alleged lapses of memory, if given the maximum benefit, [were] consistent with finding she can never climb ladders, ropes, and scaffolds; can tolerate no exposure to hazards[;] and is limited to performing simple, routine tasks." R. 16–17; *see* R. 15–16 (citing R. 40, 45–49, 204–09, 250). ALJ Munday did not articulate how she concluded that Natalie also needed the "option to take [a] 30 minute nap at lunch." R. 15. Reading her decision as a whole, however, it appears that she copied this restriction from her prior RFC finding that Natalie "must have the option to take a 30-minute nap at lunch." R. 17 (citing R. 64). ALJ Munday explained that her prior finding was "persuasive because [Natalie's] reported activity and largely unremarkable examination findings are inconsistent with exertional and manipulative limitations, but her narcolepsy precludes safely climbing ladders, ropes, and scaffolds or working in proximity to hazards, as detailed" in her current RFC finding, R. 17 (citing R. 15).

ALJ Munday then evaluated some of the medical-opinion evidence in Natalie's current record. *See* R. 17–18 (citing R. 90–91, 101–02, 343). She did not mention either Dr. Darden's medical findings for DDS in May 2018, R. 399–400, or Dr. Khoury's June 2019 letter in which

he opined that Natalie's "proven narcolepsy" was at that time causing "significant symptoms of excessive sleepiness" despite the fact that she was "being treated with multiple medications for this problem," R. 349. *See generally* 20 C.F.R. § 416.920c(b) (specifying the manner by which the ALJs "will articulate how persuasive [they] find all medical opinion and prior administrative medical findings to be"). "In sum," ALJ Munday concluded that Natalie's current RFC was "supported by [her] minimal treatment history, largely normal examination findings, and reported activity during the period at issue." R. 18.

B.    *Analysis*

ALJ Mundy's RFC assessment does not survive the "deferential standard of review," *Dunn*, 607 F. App'x at 271. First, as noted, ALJ Munday did not cite any evidence or otherwise explain how she concluded that Natalie needed a 30-minute nap at lunch. R. 15. In fact, she did not connect this limitation to Natalie's narcolepsy at all. *See* R. 15–17. She simply carried it over from her prior RFC finding, R. 17 (citing R. 64), and concluded that the prior finding was "persuasive" because Natalie's "narcolepsy precludes safely climbing ladders, ropes, and scaffolds or working in proximity to hazards[] as detailed" in her current RFC finding, R. 17. This conclusion does not logically address her separate RFC finding that Natalie should have the option to take a 30-minute nap at lunch, R. 15. ALJ Munday's decision to credit Natalie's "reported tendency to fall asleep and her alleged lapses of memory" in finding that Natalie cannot work around heights or hazards "and is limited to performing simple, routine tasks," R. 17, also fails to address her RFC finding that Natalie needs a 30-minute nap only at lunchtime. *See generally Thomas*, 916 F.3d at 311.

Second, ALJ Munday did not logically explain why limiting Natalie to simple, routine tasks reasonably accommodated her "tendency to fall asleep," R. 16–17. As Natalie points out,

ECF No. 41, "the ability to perform simple tasks differs from the ability to stay on task," *Mascio*, 780 F.3d at 639. Natalie testified that her narcolepsy causes her to "fall asleep at any time." R. 40 (July 2019). She could tidy her house, do laundry, and wash dishes, but it might take her "days [or] hours" to finish those basic chores because she would "start, fall asleep[,] wake up do a little more[, and] fall asleep" again. R. 206 (Mar. 2018). Regina also said that Natalie will "fall asleep at any time," including while she's just "sitting around talking" with people. R. 250; *see* R. 16 ("[Regina] reported that the claimant fell asleep during conversations." (citing R. 250)). Natalie "seem[ed] to be able to stay focused when she is driving" short distances, R. 250; *see* R. 47–48, 207–08, because she "will pull over and take a nap" if she is about to fall asleep, R. 250. Natalie usually fell asleep "soon after" waking up, and she slept "often" throughout the day. R. 204–05 (Mar. 2018); *see also* R. 326–27 (Oct. 2016); R. 339 (Apr. 2018). She was "profoundly sleepy" when awake. R. 356 (April 2019); *see also* R. 33–36, 40–41, 44, 48–49 (July 2019); R. 326–27 (Oct. 2016); R. 333–34 (Aug. 2016); R. 338 (Apr. 2018).

ALJ Munday concluded that Natalie's severe narcolepsy could reasonably be expected to cause these symptoms, R. 16, and she specifically credited the testimony that Natalie "tended to fall asleep," R. 16–17. Nonetheless, ALJ Munday never explained how limiting Natalie to simple, routine tasks with an optional 30-minute nap at lunchtime reflected the fact that Natalie's "narcolepsy would cause [her] to experience episodes of loss of consciousness . . . necessitating [unplanned] breaks in work," *Monroe*, 826 F.3d at 188. She also "never made specific findings about whether" Natalie actually experienced extreme fatigue when awake, *id.* at 188–89, and, if so, the extent to which this symptom limited Natalie's ability to complete simple, routine tasks at an acceptable pace. This missing analysis is especially troubling because the record contains Natalie's uncontradicted testimony that she could do her current unskilled job packing bottles

only "once a week, if that," R. 33, and that specific narcolepsy symptoms (e.g., falling asleep abruptly, fatigue, memory lapses) had "interfered with maintaining [unskilled] employment in the past," R. 15. *See* R. 40–41, 49. ALJ Munday did not explain how she evaluated any of this evidence in her RFC determination.

Third, substantial evidence does not support any of the ALJ's reasons for concluding that Natalie's "allegations regarding the severity of her [narcolepsy] symptoms and limitations are not supported by the record," R. 16. As noted, ALJ Munday found that Natalie's current "record shows a single appointment for narcolepsy during the period at issue and [Natalie] indicated that she had not required medication or other treatment prior to [this] April 2019 appointment." *Id.* (citing R. 356–59). In fact, Natalie had two appointments in 2016 where she specifically asked to restart narcolepsy medications. R. 333 (Aug. 2016); R. 326 (Oct. 2016). ALJ Munday also did not point to any language in Dr. Khoury's April 2019 treatment note to support her finding that Natalie "indicated that she had not required medication or other treatment" before this visit, R. 16. *See Brown*, 873 F.3d at 269 ("[T]he ALJ must build an accurate and logical bridge from the evidence to his conclusion that the claimant's testimony was not credible." (cleaned up)).

The fact that Natalie did not *receive* narcolepsy treatment "in almost 10 years," R. 356, does not mean that she did not *require* it, R. 326, 333. *See, e.g.*, *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) ("A claimant cannot be penalized for failing to seek treatment she cannot afford."); *cf. Dunn*, 607 F. App'x at 274 ("[T]here may be any number of reasons for a physician to prescribe a 'conservative' course of treatment, and it is for that reason that such treatment alone would not necessarily render a claimant ineligible for disability benefits."). On Appeal, Natalie explains there was "a period of about 10 years with no [narcolepsy] treatment" because "[h]aving no insurance means no doctors visits." ECF No. 41. She also "had an

outstanding bill from 2007 that had to be paid before Dr. Khoury would see" her again. *Id.* ALJ Munday knew from Natalie's prior SSI/DIB claims that Natalie had previously testified there were times in 2002–2014 that she did not seek or follow recommended narcolepsy treatment because she "did not have the money." R. 65; *see also* R. 67. Yet, ALJ Munday never asked Natalie to explain her sporadic and "minimal treatment" for narcolepsy symptoms in 2014–2019, R. 18. *See* R. 42–44. This was error. *See Walker v. Harris*, 642 F.2d 717, 714 (4th Cir. 1981) (holding that an ALJ who presides over a hearing at which the claimant appears without legal representation has an independent "duty [to] scrupulously and conscientiously . . . probe into, inquire of, and explore for all the relevant facts" (internal quotation marks omitted)).

ALJ Munday also found that Natalie's testimony describing work-preclusive narcolepsy symptoms was "not supported by the record" because, "[e]ven before beginning treatment" in April 2019, Natalie "was able to be cooperative with medical personnel, and her mental and physical examinations were generally unremarkable, finding full strength, range of motion, and reflexes; normal gait; and intact memory and concentration." R. 16 (citing R. 332 (Aug. 2016); R. 339–42 (Apr. 2018)). Nothing in the ALJ's decision "indicate[s] how any of the facts [s]he cited show that [Natalie] did not lose consciousness [several] times daily or suffer extreme fatigue." *Monroe*, 826 F.3d at 190. The normal musculoskeletal findings on Natalie's physical exams have nothing to do with her allegedly disabling narcolepsy symptoms. *Cf. Mascio*, 780 F.3d 639 (ALJ could not rely on claimant's non-compliance with her mental health treatment as a reason "for rejecting [her] statements as to pain" because that "reason has nothing to do with pain"); *Monroe*, 826 F.3d at 190 ("In citing 'normal' results from pulmonary and respiratory tests and an EEG, the ALJ did not explain why he believed these results had any relevance to the question of what symptoms Monroe suffered from narcolepsy."). While the fact that Natalie

exhibited "intact memory and concentration" at one consultative exam in April 2018, is not

irrelevant to "the severity of her symptoms and limitations," R. 16 (citing R. 343), it also does

not logically undercut Natalie's testimony that being narcoleptic meant that she can lose

consciousness at any time, naps several times a day, takes breaks when doing simple household

chores, needed former employers to repeat instructions, and failed to complete tasks on schedule

at multiple prior unskilled jobs, R. 40–41, 45–49, 204–06, 250. The ALJ's contrary "conclusion

was not supported by substantial evidence because the record, when read as a whole, reveals no

inconsistency between the two." *Hines*, 453 F.3d at 565.

The ALJ's final reason for rejecting Natalie's testimony is also legally flawed. R. 16

(activities of daily living). ALJs should consider relevant information about a claimant's

activities of daily living ("ADLs") as one factor in determining the claimant's RFC. 20 C.F.R. §§

416.929(c)(3)(i), 416.945(a). However, "[a]n ALJ may not consider the *type* of a claimant's

activities without also considering the *extent* to which she can perform them." *Woods*, 888 F.3d

at 694. If an ALJ rejects statements describing the limited extent of the claimant's activities, her

decision must build an accurate and logical bridge from other relevant evidence in the record to

her conclusion that the qualifying statements are not credible. *See Monroe*, 826 F.3d at 189.

Moreover, the Fourth Circuit has long "bemoaned the tendency of ALJs to overstate claimants'

[RFCs] and ability to work based on their daily activities." *Oakes v. Kijakazi*, 70 F.4th 207, 216

(4th Cir. 2023) (cleaned up). "A claimant's inability to sustain full-time work due to pain and

other symptoms is often consistent with her ability to carry out daily activities" at home. *Arakas

v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 101 (4th Cir. 2023). "The critical differences between

activities of daily living and activities in a full-time job are that a person has more flexibility in

scheduling the former than the latter, can get help from other persons, and is not held to a

minimum standard of performance, as she would be by an employer." *Id.* (cleaned up) (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). Thus, ALJs typically cannot rely on the claimant's ADLs alone to show that she could sustain full-time work. 20 C.F.R. § 416.972(c).

ALJ Munday's decision contains a brief but reasonably accurate summary of Natalie's reported ADLs during the relevant time. *See, e.g.*, R. 16 ("The claimant reported that she could do laundry, clean, and wash dishes, *but sometimes fell asleep before completing tasks*. . . . She also reported that she went to church *once or twice a week*." (emphasis added)). As part of her symptoms analysis, however, ALJ Munday concluded that Natalie had "acknowledged that her narcolepsy did not prevent her from doing housework, preparing simple meals, driving, shopping in public, and attending church services." R. 16. She also concluded that her own RFC finding was "supported by" Natalie's "reported activity during the period at issue," R. 18, and that the record did not support Natalie's statements describing additional or more severe narcolepsy "symptoms [or] limitations," R. 16. The ALJ's characterization of Natalie's "reported" ADLs describes the type of activities she performed, while inexplicably ignoring Natalie's testimony about the limited extent to which she actually performed them. R. 16. It does not acknowledge Natalie's undisputed testimony that it might take her "hours [or] days" to do routine housework because she would "start[,] fall asleep[,] wake up do a little more[, and] fall asleep" again. R. 206. It does not mention Natalie's undisputed testimony that she can "microwave" a frozen dinner, R. 47, but usually her husband made sure she ate when he got home from work, R. 45. It does not acknowledge Natalie's and Regina's statements that Natalie "seem[ed] to be able to stay focused when she is driving" short distances, R. 250; *see* R. 47–48, 207–08, because she "will pull over and take a nap" if she is about to fall asleep, R. 250. Moreover, Natalie's *actual* "reported activities during the period at issue," R. 18, are not at all inconsistent with a conclusion

that her inability to control when she loses consciousness, her profound fatigue, and her memory problems precluded her from sustaining full-time work, R. 33–38, 40, 49, 53–54, 147–48, 153, 184, 189, 201–17. *See* ECF No. 33 (citing R. 53–54); ECF No. 41, at 1–2. ALJ Munday accurately recounted Natalie's qualifying statements earlier in her decision, R. 16, but she did not explain why she rejected them when she got to the RFC determination, R. 16, 18. This was error. *See Monroe*, 826 F.3d at 189.

## IV. Conclusion

To summarize, ALJ Munday made several legal errors when determining Natalie's RFC from September 3, 2014, through September 18, 2019. She did not provide a narrative discussion describing how any specific evidence supported her RFC finding that Natalie's severe narcolepsy still allowed her to perform "simple, routine tasks" as long as she had the "option to take [a] 30-minute nap at lunch," R. 15. *See Thomas*, 916 F.3d at 311. She cherry-picked selected facts from Natalie's consistent statements describing minimal and sporadic ADLs and failed to grapple with probative evidence of Natalie's repeated failed attempts to sustain full-time unskilled work over the past twenty years. *See Arakas*, 983 F.3d 83 at 101. She misstated facts about Natalie's actual treatment history for narcolepsy, and she may have impermissibly penalized Natalie for failing to seek treatment that she could not afford. *See id.* at 99; *Lovejoy*, 790 F.2d at 1117. Accordingly, substantial evidence does not support the Commissioner's final decision denying Natalie's claim for SSI benefits filed on June 26, 2017.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A

judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding district judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: July 18, 2024

Joel C. Hoppe
United States Magistrate Judge